**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2788 EDA 2019 |

Appeal from the Decree September 11, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000640-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2789 EDA 2019 |

Appeal from the Decree September 11, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000641-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.L.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3334 EDA 2019 |

Appeal from the Order Entered November 12, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0003263-2017

| IN THE INTEREST OF: C.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.P., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3335 EDA 2019 |

Appeal from the Order Entered November 12, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0003262-2017

BEFORE:  SHOGAN, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY McCAFFERY, J.:                    **FILED APRIL 17, 2020**

J.P. (Father) files these consolidated appeals from the decrees entered in the Philadelphia County Court of Common Pleas, granting the petitions of the Philadelphia Department of Human Services (DHS) and involuntarily terminating his parental rights to his minor, dependent children, C.C.P. and D.L.B. (collectively, the Children), pursuant to Subsections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[1]  Father further appeals from the orders changing the Children's permanent placement goals to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.  After review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S. §§ 2101-2938.  The trial court consented to the voluntary relinquishment of parental rights of the children's mother, E.B. (Mother) on November 12, 2019.  Mother has not filed a separate appeal or participated in the instant appeal.

C.C.P. was born in October 2014, and D.L.B. was born in September 2016. The family most recently came to DHS's attention[2] due to a report on September 25, 2017, that Father and the Children resided in an abandoned house infested with bed bugs; that Children were dirty and disheveled; and that Father abused Percocet. DHS determined the home was "entirely unfit for human habitation. Children would not be safe at this location." DHS Exhibit 4. Once DHS was able to speak to Father, Father agreed the residence was inappropriate for the Children and not to return. *See* DHS Exhibit 5.

Father and the Children's whereabouts then became unknown until a custody hearing on December 8, 2017. It was discovered that Father had relocated with the Children to New Jersey without the court's approval, and, as a result, Father was found in contempt of court and incarcerated. **See** DHS Exhibit 6. On that same day,

> DHS obtained an Order of Protective Custody (OPC) for both Children and placed them in [f]oster [c]are through Tabor Northern Community Partners. The OPC was lifted at the [s]helter [c]are [h]earings held for both Children on December 11, 2017. . . . The [c]ourt lifted the OPC and transferred temporary legal custody to DHS, and placement to continue in [f]oster [c]are. Mother and Father [were] to have supervised visits at the Agency.

> \* \* \*

> On 1/11/2018, Father tested positive for marijuana and phencyclidine (PCP).

---

[2] The family had prior interaction with DHS beginning 2014. **See** DHS' Petition for Involuntary Termination of Parental Rights, 8/26/19, Exh. "A," Statement of Facts, ¶ a.

On February 21, 2018, [a]djudicatory [h]earings were held for both Children. . . . The [c]ourt ordered legal custody of the Children to remain with DHS, and placement to continue in Foster Care through Tabor. Children [were] doing well. Parents [were] to have supervised visits at the Agency as arranged and separate line-of[-]sight/hearing for Father. Parents [were] referred to the [CEU] for a forthwith drug and alcohol screen, assessment, dual diagnosis, and three random drug and alcohol screens. Parents [were] referred to the Achieving Reunification Center (ARC) and ordered . . . to comply with all Single Case Plans (SCP) objectives and recommendations. Mother [was] to sign all necessary releases.

Trial Ct. Op., 10/23/19, at 9-10 (citations to record omitted).

Throughout the next year and a half, the trial court conducted regular permanency review hearings, maintaining the Children's placement and permanent placement goals. **See** DHS Exhibits 7, 8. The court ordered drug testing for Father, and he tested positive for marijuana and/or PCP use on May 17, June 6, August 23, and December 21, 2018, and February 26, 2019. **See** DHS Exhibits 12, 13, 14.

Thereafter, on August 26, 2019, DHS filed petitions to involuntary terminate Mother's and Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and for a goal change. Combined termination/goal change hearings were conducted on September 11 and November 12, 2019.[3] Of relevance, Father was present and represented by

_____

[3] We observe that, while the court terminated Father's parental rights to the Children on September 11, 2019, the court relisted the matters for November 12, 2019 to address Mother's voluntary relinquishment of her parental rights, as well as the goal change. **See** 9/11/19 at 51.

counsel. The Children were represented by a guardian *ad litem* during these proceedings.[4] In support of its petitions, DHS presented the testimony of case manager Angela Taylor[5] of Community Umbrella Agency (CUA), Tabor Northern Community Partners. DHS additionally presented Exhibits DHS-1 through DHS-14, which were admitted without objection. N.T., 9/11/19, at 11-12. Further, Father testified on his own behalf.

By decrees entered September 11, 2019, the trial court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Subsequently, by orders entered November 12, 2019, the trial court changed the Children's permanent placement goals from reunification with parent and/or guardian to adoption. Thereafter, on September 30 and November 21, 2019, respectively, Father, through appointed counsel, filed timely notices of appeal, as well as concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court *sua sponte* consolidated the appeals. The trial court issued separate opinions as to termination of Father's parental rights and the goal

---

[4] At the permanency review hearing on June 6, 2019, the trial court found that, due to the Children's ages, the guardian *ad litem* may represent them as both guardian *ad litem* and legal counsel with respect to termination/goal change. **See** DHS Exhibits 7, 8.

[5] We note that while the trial court and Father's brief referred to the caseworker's first name as Angela, DHS referred to her as Ashley. **Compare** Trial Ct. Op. at 14; Father's Brief at 11, **with** DHS' Brief at 8.

change on October 23 and December 18, 2019, respectively. We, however,

address the issues together in one memorandum.

On appeal, Father raises the following issues for our review:

1. Whether the trial court committed reversible error, when it involuntarily terminated [F]ather's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 [Pa.C.S. § 2511(a)(1), (2), and (5).[6]]

2. Whether the trial court committed reversible error when it involuntarily terminated [F]ather's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotional needs of the child[ren] as required by the [A]doption [A]ct, 23 [Pa.C.S. § 2511(b)?.

3. Whether the trial court abused its discretion in granting a goal change to adoption, where the goal change from reunification to adoption was not supported by clear and convincing evidence.

4. Whether the trial court erred because the evidence was overwhelming and undisputed that [F]ather demonstrated a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship with the [C]hildren.

Father's Brief at 8.

In matters involving involuntary termination of parental rights, our

standard of review is as follows:

---

[6] Father does not raise any challenge under Subsection 2511(a)(8), either in his statement of questions involved or argument section of his brief. *See* *Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues). Any such challenge is, therefore, waived.

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

- 7 -

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (citation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's termination decrees pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> \* \* \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> \* \* \*

- 8 -

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015), *quoting In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (quotation marks and citations omitted).

In his first issue, Father, argues, in pertinent part, that when the family was initially assessed in 2017, the Children's care and environment were found to be appropriate. Father's Brief at 19. He maintains that since then, he has worked to complete that which was been required of him in working towards reunification:

> It is clear through testimony given at the September 11, 2019 hearing, that Father worked to meet his objectives to the best of his ability and has availed himself of every service available to him in order to be reunified with his children. Grounds do not exist to terminate [F]ather's rights under subsection 2511(a)(2) because it is clear that [F]ather has the present capacity to care for his children.

*Id.* After careful review, we conclude no relief is due.

> The trial court stated at the September 11, 2019, termination hearing:

> [F]ather has not remedied the issues that brought the [C]hildren into care. Father has not stopped using drugs. As recently as July of this year, he tested positive for PCP. His explanation that it was mixed in with another illegal drug provides no evidence of [F]ather remedying the issue, and in fact, it exacerbates the issue. He's been testing positive all along with the same drugs. And PCP being one of the most dangerous drugs on the market regarding the psychological destabilization of a party. . . [.]

> Further, [F]ather says he's got a house. But, unfortunately, it's not big enough for the [C]hildren. And [F]ather asked us to wait until he gets things together so he can get a bigger house. We're waiting now eighteen months. Every time he comes into court, he tells us he's working on [the house]. And it's never completed. Never to a point where it's appropriate for two children.

> Father completed financial responsibility but has not demonstrated financial responsibility. . .you have not supported the [C]hildren.

> He has a housing certificate, yet he doesn't have housing. I mean, it's a recognition that he went through the training that we've

- 10 -

offered, but it's also an acknowledgment that he has not accomplished any of the deeds and any of the skills that these services in training was intended to provide [F]ather.

Further, he has not graduated from visitation which is now every other week for one possibly two hours. He has failed to come in to take our drug screens despite being notified by the case worker on numerous occasions.

And, if there's an inconsistency between the testimony of the case worker and the father, I deem the case worker to be more credible. She's been on this case for a substantial period of time. All of her work efforts and all of her activities on behalf of the children are well documented. She's very familiar with the case. She has good insight into the case, and I trust her judgment and give her testimony the full weight that it deserves.

The father has failed to remedy those issues. He's not currently serving as a parent. The testimony is clear that while the [C]hildren know him, they do not recognize him as a parental figure.

The placement with the current caregiver has been a very successful placement for the [C]hildren. They have benefitted from it. They have continued to have consistent healthcare checkups which is one of the factors that brought the [C]hildren into care initially. . . [.]

Taking all the evidence as a whole, I find that it is clear and convincing that the evidence satisfies the Adoption Act under Sections 2511(a)(1), (2), (5), and (8). . . .

N.T., 9/11/19, at 48-51.

Further, in finding grounds for termination of Father's parental rights

pursuant to Section 2511(a)(2), as well as subsections (a)(1), (5), and (8),

the trial court stated:

This [c]ourt heard credible, persuasive, clear and convincing evidence from Angela Taylor, the current CUA Case Manager for the Children. She stated the Children came into care in September 2017, because of deplorable living conditions in . . .

Father's home . . . . The Children were also not medically and dentally up to date and non-compliant. Further, . . . Father tested positive for marijuana and PCP. The Children were [a]djudicated [d]ependent and placed in [f]oster [c]are on 2/21/2018.

Ms. Taylor testified various Single Case Plan meetings . . . were held and one objective for Father was to attend and complete substance abuse treatment. She noted that Father had tested positive at various drug screenings . . . . She stated she sent Father text messages, and called a land line telephone to notify Father to present himself for a random drug screen, but she was unsuccessful. She also personally handed Father a letter for a 24-hour random [drug screen], however, Father did not comply.

Regarding Father's employment status, Ms. Taylor testified Father never provided her with employment documentation as required as an SCP objective. Father continues to reside [at his original address], where he continues to work on improving the home. Father claims he lives elsewhere, in a one-bedroom apartment, however never provided her with an address. Ms. Taylor opined that Father's current living situation is not suitable for reunification. She stated that Father's visits were modified to two[-]hour[s] biweekly, and[,] while he initially missed the first two visits, he has made the subsequent visits. His last visit with the Children was last Thursday. She had observed some of the visits and noted that the room was full of toys, and Father primarily sat there watching the Children play with the toys. He did bring snacks and food for lunch. [She] and staff members attempted to redirect Father to engage with the Children during the visits[,] such as take them to the bathroom, change the diaper, however, Father must be prompted and redirected.

The evidence was clear and convincing that Father's conduct for at least six months immediately filing of the petition evidenced a settled purpose of relinquishing parental claim and that he failed to perform parental duties. Although[ ] Father testified and provided Certificates from ARC for participation in housing assistance and a financial education program, the evidence was clear that Father shows a continued incapacity to provide for the essential parental care, control and well-being of the Children.

The evidence is also clear and convincing that the conditions which led to the removal and placement of the Children continue to exist. Father continues with housing issues, claiming he is

repairing the residence that lacks basic necessities, and currently lives in a one[-]bedroom apartment, which he claims will convert into a two[-]bedroom apartment[ ] that can house his Children. Further, Father's drug abuse issues continue and he has not completed the program at Merakey, claiming he could not attend because he needed to make money for housing. Father tested positive at various drug screenings . . . Father also claims Ms. Taylor only contacted him recently for drug screens, which contradicts the testimony by Ms. Taylor. This [c]ourt resolves issues of credibility by giving weight and credence to the testimony of the CUA worker. Father also claims to work part-time at a temporary placement agency, however, [he] never provided documentation.

This [c]ourt finds that DHS and the placement agency made reasonable efforts to provide Father with services to aid the reunification with his Children, however[,] it is imperative for Father to cooperate with the services offered by DHS. Father failed in his duty to make diligent efforts and actively participate in those services offered to him. This [c]ourt found that DHS proved by clear and convincing evidence that Father failed to work towards reunification with the Children, and Father is unable and unwilling to create a stable environment for the Child[ren]. His lack of action demonstrates his inability to care for these Children now and in the future.

This [c]ourt finds the Children have a right to have proper parenting and fulfillment of their potential in a permanent, healthy, and safe environment. They have a present and future need for essential parental care which is necessary for their physical and mental well-being. This [c]ourt found that Father's conduct for at least the six months prior to the filing of the Termination Petition[] established the criteria[,] based on the clear and convincing evidence presented, to terminate Father's parental rights based on 23 [Pa.C.S. § 2511 (a)(1), (2), (5), and (8)]. This [c]ourt also found that termination of Father's parental rights would best serve the needs and welfare of the Children.

Trial Ct. Op. at 23-26.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). As we discern no abuse of discretion

or error of law, we do not disturb the trial court's findings. The record reveals that Father failed to complete his objectives aimed at reunification with the Children and remedy the conditions that brought the Children into care. Specifically, Ms. Taylor indicated that the case most recently opened in September 2017 due to Father's substance abuse, poor housing conditions, and failure to ensure the Children's medical and dental needs. N.T., 9/11/19, at 15. She further reported Father's SCP objectives aimed at reunification involved substance abuse, employment, housing, and visitation. *Id.* at 16-20. Father, however, failed to complete drug and alcohol treatment, and failed to engage in random drug testing. Father acknowledged he failed to complete treatment, explaining his treatment sessions conflicted with his work schedule. *Id.* at 36. Father additionally continued to test positive for marijuana and/or PCP when court-ordered; indeed, he admitted to using illegal substances as recently as July 2019. *See id.* at 16-17, 25, 28, 38; *see also* DHS Exhibits 7, 8, 11, 12, 13, and 14. Moreover, Father did not have appropriate housing[7] or present documentation of employment.[8] *See id.* at 18-19, 32-33, 45.

_____

[7] Father's housing situation remained "not suitable for reunification." Ms. Taylor stated that he advised her that "[h]e was staying at another location that he was supposed to give me the address to, but never gave me the address to." N.T., 9/11/19, at 19, 28-29.

[8] While Father claimed to work at a temp agency, he conceded he failed to provide documentation of same. *Id.* at 32-33.

Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for his physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id*. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on

the circumstances of the particular case." ***In re K.Z.S.***, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.***, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

***In re Adoption of C.D.R.***, 111 A.3d at 1219 (quoting ***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

On appeal, Father argues DHS failed to establish a lack of bond or relationship between him and the Children. Father's Brief at 21. Father states, "Here, DHS[] has wholly failed to prove that the family ties do not exist between the children and Father, nor has DHS shown that the family ties between the children and Father hinder the children." ***Id.*** He contends:

By failing to consider the needs and welfare of the [C]hildren, and their relationship with Father, who was attempting to bond frequently with his children, the trial court committed reversible error by ordering the termination of Father's parental rights. Adequate grounds for termination of [F]ather's parental rights do

not exist under the Adoption Act subsections 2511(a)(1) and (2). Additionally, the requirements of subsection 2511(b) are not met because the best interests of the [C]hildren are not served by termination of Father's parental rights.

*Id.* at 22.

The trial court stated the following at the termination hearing:

[T]he evidence clearly and convincingly establishes under 2511(b) that there would be no irreparable harm if [F]ather's rights were terminated because although [F]ather has a relationship, it is not a parental relationship. And it would be in the best interest of the [C]hildren that rights be terminated so that they could be permanently cared for and provided future security both physical and emotional security and continue to have their medical needs and other needs met on a consistent basis.

N.T., 9/11/19, at 51.

Further, in finding that the Children's emotional needs and welfare favor termination pursuant to Section 2511(b), the trial court reasoned:

Testimony by Ms. Taylor, the case worker, provided credible, persuasive evidence regarding the Children's physical, developmental and emotional needs and welfare. She noted the Children have been in care since December 2017, and they have progressed really well in placement. They have been with the pre-adoptive [f]oster [p]arent since September 2018, and have a strong parental bond with her. She has observed the Children in the [f]oster [h]ome and notes the [f]oster [p]arent provides the Children with safety and permanency. Father, on the other hand, has no parental bond with the Children, although they recognize him as their [f]ather through the visits but are not bonded to him.

The Children, who are now five and three years old, are doing well, and the evidence on the record shows that their physical, developmental, emotional needs and overall welfare are being tended to by their [f]oster [p]arent. The totality of the evidence on the record supports the [c]ourt's conclusion that termination of Father's parental rights is in the best interest of these [c]hildren. The [c]ourt found that termination of Father's parental rights met the developmental, physical and emotional needs and

- 17 -

welfare of the Children, and the statutory requirements for involuntary termination of his parental rights were met pursuant to 23 [Pa.C.S. § 2511(b)].

Trial Ct. Op. at 27-28.

As to subsection 2511(b), upon review, we again discern no abuse of discretion. The record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

Importantly, Father's visitation with the Children did not progress past supervised and, in fact, regressed from weekly to bi-weekly. *See* N.T., 9/11/19, at 20, 27, 47. Further, CUA case manager, Angela Taylor, indicated that Father's parenting ability did not improve, despite any completion of services. *See id.* at 30. She testified: "[Father] has two hours a visit. After about an hour, [he] is kind of tapped out of the visit. The [C]hildren [are] in a room where there is a bunch of toys and things. [Father] allows them to use his phone[. He] is primarily sitting there while the [C]hildren are playing during the time of visitation." *Id.* at 20. Ms. Taylor continued: "[Father] is constantly having to be redirected or needed some type of guidance or assistance as far as caring for the [C]hildren during the time of the visits." *Id.* at 21. She further observed that Father and Children did not share a beneficial relationship or parental bond. Rather, the Children saw Father as a

visitation resource. ***See id.*** at 21, 27 ("The [C]hildren know[ ] Father as coming to visits.").

Moreover, the Children had been in their current pre-adoptive resource home since they were placed. ***See*** N.T., 9/11/19, at 22, 27. Ms. Taylor, testified that the Children were happy and doing well with their needs met. ***See id.*** at 22-23, 26-27. She noted that Children were "doing really well. . . . They have progressed really well behavior-wise, educational-wise, and they have made a lot of progress in the foster home they've been at." ***Id.*** at 22. Ms. Taylor indicated that the Children's parent-child relationship was with their resource parent and that they looked to her for comfort. ***See id.*** at 22, 27. Importantly, the Children had a relationship with their resource parent even prior to placement. ***See id.*** at 22. As such, Ms. Taylor indicated that the Children would not suffer harm if Father's parental rights were terminated and opined that it would be in the Children's best interest to be freed for adoption. ***See id.*** at 21.

While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. At the time of the hearing, the Children had been in placement for almost two years, and are entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id***. at 1125. Rather, "a parent's basic constitutional right to the

custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Lastly, we turn to the question of whether the trial court appropriately changed the permanency goal to adoption. Father argues the trial court failed to consider the factors set forth in 42 Pa.C.S. § 6351 (discussed ***infra***). He further contends that "for a period of time, before the [C]hildren were in placement, [they] resided with [him] and were well cared for." Father's Brief at 23.

"In cases involving a court's order changing the placement goal from "return home" to adoption, our standard of review is abuse of discretion." ***In re S.B.***, 943 A.2d 973, 977 (Pa. Super. 2008).

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must

guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Additionally, Section 6351(f.1)(2) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

> * * *

> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1)(2).

Upon review of the record, we conclude Father's challenge to the goal change lacks merit. The record reveals that a change of the permanency goal to adoption was in the Children's best interests. Father had failed to complete his SCP objectives. *See* N.T., 9/11/19, at 16-19, 25, 28, 32-33, 38, 45. Moreover, the Children had been in care for almost two years and Father's visitation remained supervised. *See* N.T., 9/11/19, at 20, 27, 47. Critically, CUA case manager, Angela Taylor, testified that Father's parenting ability had not improved and that there was no parental bond between Father and the Children. *See id.* at 21, 27, 30. Rather, the evidence established that the

Children were doing well and shared a parental bond with their resource parent. ***See id.*** at 22, 26-27. Therefore, the record supports that a goal change was in the best interests of the Children. Accordingly, after review of the record, we again discern no abuse of discretion, and conclude that the trial court properly changed the Children's permanent placement goals to adoption.

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b), and changed the Children's permanent placement goals to adoption.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/17/20